IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

DEBRA WALKER,

      Plaintiff,

v.

                                                                       Case No. 14-1425-JTM

F.H. KAYSING COMPANY, L.L.C.,

      Defendant.

**MEMORANDUM AND ORDER**

Plaintiff Debra Walker seeks monetary damages from her former employer, defendant F.H. Kaysing Company, L.L.C. ("FHK"), for alleged race discrimination, harassment, and retaliation in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, et seq. This matter comes before the court on defendant's Motion for Summary Judgment (Dkt. 64). For the reasons stated below, the court grants defendant's motion.

**I.    Legal Standard for Summary Judgment**

Summary judgment is appropriate if the moving party demonstrates that there is no genuine dispute as to any material fact, and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). A fact is "material" when it is essential to the claim, and the issues of fact are "genuine" if the proffered evidence permits a reasonable jury to decide the issue in either party's favor. *Haynes v. Level 3 Communs.*, 456 F.3d 1215, 1219 (10th Cir. 2006). The movant bears the initial burden of proof and must show the lack of evidence on an essential element of the claim. *Thom v. Bristol–Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2004) (citing *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23 (1986)). The nonmovant must then bring forth specific facts showing a genuine issue for trial. *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir.

2005). These facts must be clearly identified through affidavits, deposition transcripts, or incorporated exhibits—conclusory allegations alone cannot survive a motion for summary judgment. *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal–Mart Stores*, 144 F.3d 664, 670 (10th Cir.1998)). The court views all evidence and reasonable inferences in the light most favorable to the non-moving party. *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

Title VII complicates these procedural rules with an added burden-shifting framework, at least in cases where plaintiffs, like Walker, offer indirect discrimination evidence. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-05 (1973). With respect to each of her claims, Walker carries the initial burden of establishing a prima facie case of discrimination. The burden shifts to FHK to provide a legitimate, nondiscriminatory reason for its actions. The burden then returns to Walker to prove that FHK's stated reasons for its actions are a pretext for discriminatory intent. *Lounds v. Lincare, Inc.*, 812 F.3d 1208, 1221-22 (10th Cir. 2015) (applying *McDonnell Douglas* framework to hostile work environment claim); *Crowe v. ADT Sec. Servs., Inc.*, 649 F.3d 1189, 1195 (10th Cir. 2011) (applying *McDonnell Douglas* framework to disparate treatment claim). If a party fails to meet its burden at any step, the court's inquiry ends and judgment as a matter of law should be entered against the unsuccessful party. *McDonnell Douglas*, 411 U.S. at 807.

**II.  Facts**

The following facts are either uncontroverted, deemed admitted, or construed in the light most favorable to plaintiff, the non-movant. Excluded from this statement are allegations of fact which are not supported by the cited evidence, which are grounded on hearsay or other inadmissible evidence, or which reflect an unexplained and unjustified contradiction of earlier deposition testimony. *See Franks v. Nimmo*, 796 F.2d 1230 (10th Cir. 1986).

FHK is a federally licensed customs broker that facilitates imported goods into the United States. FHK hired Walker, an African-American, as a temporary employee in July 2005. Walker became a full-time account manager in October 2005. During her eight years at FHK, she received periodic raises, good performance evaluations, two interest-free loans, and three payroll advances. In 2011, FHK management issued a written warning to Walker for insubordination at a meeting discussing her failure to complete entries on six accounts. Walker wrote an addendum to that written warning, explaining her actions and contesting management's account of the meeting.

### The Racist Client[1]

Walker worked as the account manager for Aeroflex, which required her to frequently meet with Jessica Leth-Sulzle, Aeroflex's contact person. In early 2011 (January or February), Walker reported to Abbie Booth, FHK's office manager, that Jessica had made some offensive, racists comments to her. Walker told Booth:

> Jessica's a racist, and she's hateful, and she gets off on scaring me. She always lets me know, if I'm not happy, all I have to do is call. And [] Jessica [told] me that she felt black people didn't belong in the workplace; they got work because of their race. She stated to me that her and her family went to a company picnic and there was a black family there, and her son was afraid of these black people. And she started to laugh because I think she said he hid underneath the table. And she said, you know, he's afraid because they look so dark and different.

Dkt. 70, Ex. 3, Walker Depo. at 106:22-25; 107:1-13. Booth responded "Really?" and nodded. Booth neither investigated the matter nor gave Walker any feedback.

On August 4, 2011, Walker shared some concerns about Jessica and the Aeroflex account with Booth, who immediately, via email, reported them to Jeanie Metzen (now Brotherton),

---

[1] The parties dispute when Walker first reported the racist client to FHK. Walker claims she told FHK management about the racist client in early 2011. FHK says the first time that Walker reported her concerns in writing was in an email to management on September 13, 2013. For purposes of this motion, the court views the evidence in Walker's favor.

3

FHK's president. Metzen met with Jessica to discuss "if Aeroflex was happy with the service level provided by [FHK] along with if Aeroflex had any issues with any of [FHK's] employees [whom] they deal with on a day to day basis." Dkt. 70, Ex. 5 at 1. Metzen did not confront Jessica about the racist comments or discuss them with her supervisor. Walker had suggested the following action plan regarding handing the Aeroflex account: "be more assertive with [all of the] Aeroflex team [and] submit any questions, concerns or any corrections related to any shipments/Entries via email, so we can have an official clear record of events that have transpired on all transactions in hopes nothing can be misinterpreted with our client." *Id.* at 3. Metzen thanked Walker for proposing a very good plan and stated, "If you have ongoing concerns please include Abbie and I in on the communication so we can monitor." *Id.* at 2.

### Plaintiff's Request for Time Off on December 26, 2013

FHK's vacation policy states:

Vacations must be scheduled within the first two weeks of the year. Please contact your supervisor to determine the vacation scheduling. We will try to accommodate all vacation requests, but when conflicting scheduling arises, employees with greater seniority have priority in vacation scheduling.

Dkt. 70, Ex. 6.

In August 2013, Booth sent an email to all FHK employees requesting early submission of holiday vacation requests. On August 28, 2013, Walker submitted a request for paid time off (PTO) for December 26, 2013. Dkt. 64, Ex. A, Walker Depo. at 139:3-7. Booth denied the request, told Walker that she had only 6.42 hours of vacation time and no sick time for the year, and urged Walker to reserve those hours in the event she had a sick child or became sick herself. Walker then requested to take that day off without pay.

Booth and Luttrell, FHK's human resource manager, met with Walker and informed her that if she could keep her remaining vacation time intact until December 26, 2013, FHK would

permit her to apply that time and have the day off. Walker indicated that she intended to take the day off even if she did not have PTO hours.

On September 5, 2013, Metzen, Booth, and Luttrell met with Walker to inform her of management's decision regarding her request for unpaid time off on December 26, 2013. Dkt. 64, Ex. I. Metzen told Walker that "if she doesn't use any of [the 6.42 hours] between now and December 26, then [FHK] will hold that day open for her and she can use that time on that day. Debra will only have to come in a little over an hour on that day . . . [and] that failure to abide by this decision will result in termination." *Id.*

Walker emailed FHK management on September 6, 2013, asking "Would it be possible to make the time up during the week instead of coming in that day, typically when time is made up, it is done the following business day in that pay period?" Dkt. 64, Ex. J. at 3. Metzen responded to the email with a memo containing, inter alia, the following points:

> Unpaid time off during Holidays is not allowed due to the number of people taking vacation time off. We have to limit this due to the coverage needed to operate the business effectively during the holiday season.
>
> Your vacation request in 2012 was denied because by the time you sent in your request in September[,] we had already allowed the maximum number of people off for those days. As you were told in the email response dated Sept. 27, 2012 that we were going to start tracking who was off in 2012 so that we could start doing a rotation from year to year to give everyone a chance for the holiday. The only reason you have been denied for 2013 is that you may not have any vacation time left. We have stated that if you have the 6:42 hours left we will allow you to have 12/26/13 off. I will allow you to makeup the 1.58 hours the following day[,] but nothing over 2 hours will be allowed to be made up. You will be allowed to take off whatever time you have left if you do not keep the 6:42 hours intact[,] but you will be required to come in and work the difference on that day.

*Id.*, Ex. L at 1. Metzen then noted that in 2010, 2011, and 2012, Walker had used up all her vacation and sick leave before the Christmas holiday. She stated:

> Unfortunately we can only include people with paid vacation time left in this rotation to make it fair. I cannot allow a person to take time off without pay when

5

> I have people with paid vacation wanting the same days off. The person with paid vacation will have to take precedence. Everyone wants the Holidays off to spend with family but we have a business to run and cannot honor everyone's request.

Dkt. 64, Ex. L. She reiterated her decision and stated, "failure to abide by this decision will result in termination." *Id.* at 2.

On September 10, 2013, Walker wrote a memo to Metzen, stating: "I am not trying to be confrontational[.] I only want to explain to you [that] there seems to be some unfairness within FHK when it comes to me . . . ." Dkt. 70, Ex. 8. Walker pointed out that FHK's policy regarding vacation scheduling is to give the employee with most seniority the day off. She also noted that "FHK has allowed employee's (sic) off with no sick or vacation time and the threat of termination was never mentioned if they had taken this days (sic) off without time. Now for me, the rules have changed again and are to the extreme." *Id.*

This memo sparked the following emails between Luttrell, Book and Metzen on September 10, 2013. Booth wrote, "This is ridiculously out of hand! I am just so upset right now I'm not even sure what to say other than I am DONE with her." Dkt. 64, Ex. J. at 2. Luttrell wrote, "It has become obvious that no matter what approach is taken, [Walker] is determined to have the last word. I agree with Abbie, this has gotten so far out of hand that she's now arguing [with] the President of the company!" *Id.* at 1. Metzen wrote, "HAVE NOT HAD TIME TO READ YET BUT I AM ALSO DONE!!!!!!!!!!" *Id.* (emphasis in original).

### Plaintiff Sends an Email Alleging Race Discrimination

On September 13, 2013, Walker emailed Luttrell, requesting review of or a copy of her employee file. She explained this request was due to the following reasons:

> - I have made several attempts to advise management of the discrimination that is display[ed] towards me by management with no action taken because management are the individuals displaying this discrimination within this company as a result, no action has been taken.

6

- I have advised Management of my work environment being made stressful by this behavior and is currently making me physically ill, currently no[] action has been taken

- I am denied time off when I have available time and even when our company policy is backing me (ignored by management and making excuses for reasons of denial) and management does not display this same action with my (white co-workers) that were allowed time off with pay or without pay

- When I have no child care and requested to bring my child to work with me, I was denied and other white employees have been/and are allowed to bring their sick children to work and are accommodated

- Management is discriminating against me to the point of threatening termination of my job for example; I [have] been threatened with termination and not authorized time off without pay [] and my other (white co-workers and past co-workers were allowed and not threaten with termination) for example Michelle Schueneman and Carol Dennels to name a few

- Management has allowed and ignored aggressive behavior by HR towards me (Company Policy does not allow this behavior)

-Management has allowed aggressive behavior by my co-workers against me (Company Policy does not allow this behavior)

- Management has allowed, by not taking any action and ignore[d] my statement when dealing with a Hostile & Racist Client Jessica Leth-Sulzle making it mandatory to continue to deal with their aggressive behavior

- Management has depleted my Sick and Vacation with the statements "company policy does not allow you to make up time that exceeds 4 or more hours or" only 2 hours can be made up" my other white co-workers have been allowed to make up time outside of this time frame.

- Management continues to change statements and rules against me in an effort to terminate me and not towards my other (white co-workers)

- Management continued to say one thing, deny it and then state another thing to me as it appears to set me up for termination.

Dkt. 64, Ex. K at 1-2.

### The Nordahl Investigation

On or about September 10, 2013, Metzen decided to retain the services of Michele Nordahl, a human resource expert, to investigate the claims Walker made on September 10. Dkt. 70, Ex. 2, Metzen Depo. at 153-55. Nordahl interviewed Walker and five other FHK employees on Monday, September 16, 2013. Walker told Nordahl that she had filed a complaint with the KHRC on Friday. Dkt. 70, Ex. 16. Nordahl concluded:

> I do not find any type of harassment or discrimination. I believe that Debra was treated fairly in her requests and at one point, Jeanie Metzen went out of the guidelines of the policy and would allow Debra Walker to take time off when they had already had the maximum amount of people off for those days. . . . I cannot find any type of discrimination nor harassment after speaking with the employees of [FHK].

Dkt. 64, Ex. P at 13.

### Plaintiff's Termination

On September 24, 2013, Luttrell and Booth informed Walker of FHK's decision to terminate her employment. They stepped into Walker's office with the door open, while other coworkers were nearby. Dkt. 70, Ex. 3, Walker Depo at 179-80. Luttrell told Walker, "You don't need to log in."; Walker asked, "Why?"; and Luttrell said, "Your services are no longer needed." *Id.* at 180:10-18. Luttrell and Booth then helped Walker pack, while other coworkers were laughing in the background. Walker complained to Booth, "I've never seen you guys do this to anyone. We have a conference room" *Id.* at 180:21-22. Booth said, "They don't know what's going on," as laughter continued. *Id.* at 180:23.

### Plaintiff's KHRC Complaint

On September 13, 2013, Walker filled out the Kansas Human Rights Commission's ("KHRC") complaint information sheet. Dkt. 70, Ex. 10. On October 3, 2013, the KHRC received Walker's complaint charging FHK with "a violation of the Kansas Act Against

8

Discrimination, in that [she] was subjected to disparate terms, conditions, and privileges of employment and terminated due to [her] race, African American, and as acts of retaliation for having openly opposed acts and practices forbidden by the Kansas Act Against Discrimination." Dkt. 64, Ex. N. Walker alleged the following facts in that complaint:

> In approximately January 2011, I informed [FHK] management of a racist client and that I was uncomfortable speaking with the client. Subsequently, from January 2011, to at least September 5, 2013, I was subjected to disparate treatment compared to similarly situated Causasion employees, to include but not limited to my concerns not being taken seriously or otherwise ignored, not being allowed to bring my children to work when they were ill, and being denied time off from work without pay. Therefore, on September 13, 2013, I made a complaint to [FHK's] Human Resources regarding race discrimination.

*Id.* at 2. Walker received a Notice of Right to Sue letter on October 11, 2014, and filed this lawsuit on December 31, 2014.

### III. Analysis

Plaintiff asserts that defendant violated Title VII in three ways: 1) by subjecting her to disparate treatment based on her race; 2) by subjecting her to a hostile work environment based on her race; and 3) by terminating her employment in retaliation for complaining about discrimination. Plaintiff also asserts a state common law claim for intentional infliction of emotion distress. Defendant moves for summary judgment on all claims. The court addresses each claim, in turn, below.

#### A. Disparate Treatment

Plaintiff claims FHK management treated her differently in three ways: 1) they denied her vacation request, yet allowed nonminority employees with less seniority time off; 2) they allowed nonminority employees to bring sick children to work, yet denied her the same privilege; and 3) they terminated her for insubordination, yet simply gave a warning to a similarly situated nonminority. For plaintiff to establish a prima facie case of disparate treatment,

she must demonstrate that: 1) she is a member of a protected class, 2) she suffered an adverse employment action, and 3) defendant treated her differently than it treated similarly situated, non-minority employees who violated rules of comparable seriousness. *Orr v. City of Albuquerque*, 417 F.3d 1144, 1149 (10th Cir. 2005). FHK asserts that it is entitled to summary judgment on plaintiff's claim of disparate treatment because 1) she cannot show that she was treated less favorably than similarly situated nonminorities, and 2) she cannot establish that circumstances surrounding her termination raise an inference of discrimination. Dkt. 64 at 19.

"'Similarly situated employees are those who deal with the same supervisor and are subject to the same standards governing performance and discipline.'" *McGowan v. City of Eufala*, 472 F.3d 736, 746 (10th Cir. 2006) (quoting *Aramburu v. Boeing Co*., 112 F.3d 1398, 1404 (10th Cir. 1997)). To determine whether employees are similarly situated, courts "compare the relevant employment circumstances, such as work history and company policies, applicable to the plaintiff and the intended comparable employees." *Id.* (quoting *Aramburu*, 112 F.3d at 1404).

### 1. Time Off Request

Plaintiff claims that FHK denied her request for time off on December 26, 2013, yet granted the same request made by less senior, nonminority employees, namely Troy, Tracie, Carol Dannels, Cindy Tate, and Michelle Schueneman. Plaintiff, however, offers no evidence regarding these junior, nonminority employees' time off requests, e.g., 1) what day they requested off, 2) when they made their request, 3) how much PTO each accrued, and 4) the nature of their request (i.e., paid time off or unpaid time off that required making up the difference in the same pay period). Additionally, plaintiff has not shown a scheduling conflict that would trigger the seniority rule. Thus, plaintiff has failed to establish the third element of a

prima facie case of disparate treatment – that these other individuals were similarly situated to her.

Even if plaintiff could establish a prima facie case of disparate treatment, this claim fails at the pretext stage. "In determining whether the proffered reason for a decision was pretextual, we examine the facts as they appear to the person making the decision, not as they appear to the plaintiff." *Debord v. Mercy Health Sys. of Kansas, Inc*., 737 F.3d 642, 655 (10th Cir. 2013) (internal quotation marks omitted) (quoting *Luster v. Vilsack*, 667 F.3d 1089, 1093 (10th Cir. 2011) (emphasis in original). Moreover, the court does not ask "whether the employer's proffered reasons were wise, fair or correct," but only "whether [the employer] honestly believed those reasons and acted in good faith upon those beliefs." *Debord*, 737 F.3d at 655.

Contrary to her claim that FHK offered no legitimate reason for the disparate treatment (Dkt. 70 at 35), the court finds FHK articulated a legitimate, nondiscriminatory reason for denying plaintiff's vacation request – it gives precedence to people with paid time off before applying the seniority rule. Because plaintiff offers no evidence that would lead a reasonable factfinder to find this articulated legitimate reason unworthy of credence, she fails to demonstrate pretext regarding the denial of her time off request.

### 2. Privilege of bringing sick child to work

Plaintiff also offers insufficient evidence to establish a prima facie case of disparate treatment regarding bringing a sick child to work. Plaintiff only offers her own vague testimony that on at two least occasions, her request to bring a sick child to work was denied, while Abbie Booth, Cindy Tate, Sabrina Fisher, and Tracie Helmers have brought their sick child(ren) to work. Ex. 70, Ex. 3 at 134-39. Plaintiff's testimony contains several problems. First, plaintiff did bring her sick child to work on August 16, 2013. Second, she offers no details regarding the

11

circumstances regarding her coworkers bringing children to work (*e.g.*, when, why, how long, how often, preapproved or unapproved, etc.). Third, Abbie Booth is the office manager, thus she is not similarly situated to plaintiff. And there is no evidence regarding the other listed employees to infer that they are similarly situated account managers.

Even if plaintiff could establish a prima facie case of disparate treatment as to this privilege, she cannot demonstrate pretext for FHK's proffered nondiscriminatory reason for denying her request – "[Don't] want a sick kid at the office." Dkt. 70, Ex. 3 at 135:5-8. Plaintiff offers no evidence that would lead a reasonable factfinder to find that legitimate reason unworthy of credence. Thus, plaintiff fails to demonstrate pretext regarding the denial of her request to bring her sick child to work.

### 3. Disparate discipline

Plaintiff claims FHK disciplined her differently than Cindy Tate, a nonminority employee also accused of insubordination. Plaintiff, however, received a warning for insubordination in 2011. Thus, the incident leading up to her termination was plaintiff's second offense for insubordination. Plaintiff offers no evidence that shows Tate's incident was likewise a second offense. Nor does she provide evidence detailing Tate's insubordination sufficiently to support an inference that Tate was similarly situated. The summary judgment evidence, even when viewed in the light most favorable to plaintiff, fails to demonstrate that plaintiff was treated less favorably than Tate.

In sum, because plaintiff has adduced no evidence in the summary judgment record that FHK treated any other similarly situated employee differently than it treated her, the court grants summary judgment against plaintiff's disparate treatment claim.

12

**B. Hostile Work Environment**

Plaintiff claims that she was forced to endure racist treatment by defendant's client over a period of at least several months and that she was subjected to heightened scrutiny, negative criticism, and disparate treatment. Dkt. 70 at 42. FHK asserts that it is entitled to summary judgment on plaintiff's claim of hostile work environment because: 1) she did not assert a hostile work environment claim in her KHRC complaint and has thus failed to exhaust her administrative remedies; and 2) she cannot make out a prima facie case of severe or pervasive harassment based on race. To survive summary judgment on a hostile work environment claim, a plaintiff must show "under the totality of the circumstances (1) the harassment was pervasive or severe enough to alter the terms, conditions, or privilege of employment, and (2) the harassment was racial or stemmed from racial animus." *Bolden v. PRC Inc.*, 43 F.3d 545, 551 (10th Cir. 1994) (citing *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)).

**1. Plaintiff's KHRC complaint asserted a hostile work environment claim.**

Courts must liberally construe administrative complaints since they are generally written by the layman not versed either in the technicalities of pleadings or jurisdictional requirements. Gonzalez-Aller Balseyro v. GTE Lenkurt, Inc., 702 F.2d 857, 860 (10th Cir. 1983). Although plaintiff did not use the phrase "racially hostile work environment" or "racial harassment" in her KHRC complaint, she did reference her September 13, 2013 email to FHK's HR manager, which included claims that her work environment was stressful due to a racist client and that management ignored her claims and allowed aggressive behavior towards her. The court finds plaintiff's KHRC complaint sufficiently alerted FHK that she perceived her work environment was racially hostile.

13

### 2. Plaintiff Fails to Show that the Alleged Acts of Hostile Treatment Were Sufficiently Severe and Pervasive to Constitute a Hostile Work Environment.

Assuming without deciding that the court may consider the racist client evidence, the court concludes that there is insufficient evidence to establish that plaintiff was subjected to an objectively abusive working environment. Factors relevant to determining whether a reasonable jury could find a plaintiff's work environment to have been hostile include "the frequency of the conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Hernandez v. Valley View Hosp. Ass'n*, 684 F.3d 950, 957–58 (10th Cir. 2012) (quoting *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23 (1993)). "Simple teasing ... offhand comments, isolated incidents (unless extremely serious)" do not alone give rise to a hostile work environment, as they do not change the "terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 778 (1998).

Plaintiff identified three racial comments by Jessica: 1) black people don't belong in the workplace, 2) black people got work because of their race, and 3) her son was afraid of a black family that attended a company picnic and hid under a table. Plaintiff, however, must show "more than a few isolated incidents of racial enmity." *Bolden*, 43 F.3d at 551. Moreover, these comments, while offensive to plaintiff, were not severe or pervasive. Plaintiff has not presented evidence of "a steady barrage of opprobrious racial comments." *Id.* The court finds that under the totality of circumstances, plaintiff has failed to present evidence to support the inference of pervasive racial harassment. In so ruling, the court relies in part on the weaknesses of plaintiff's disparate treatment claims as discussed above.

### C. Retaliatory Discharge

To establish a prima facie case of retaliation, plaintiff must show:1) that she engaged in protected opposition to discrimination, 2) a materially adverse action and 3) a causal nexus between plaintiff's opposition and defendant's conduct. *Somoza v. Univ. of Denver*, 513 F.3d 1206, 1211-12 (10th Cir. 2008). Here, the court assumes for purposes of the motion that management decided to terminate plaintiff's employment after she engaged in protected opposition to discrimination. Plaintiff's retaliatory discharge claim nevertheless fails because she has not met her burden of showing that the proffered reasons for her termination were pretextual or unworthy of belief.

FHK asserts that it terminated plaintiff for insubordination because she would not accept management's decision regarding her request for time off and repeatedly challenged management when they refused to give her that day off unconditionally. The court rejects plaintiff's argument that if the company president had yet to read plaintiff's September 10th letter (Dkt. 70, Ex. 8), then there was no basis to terminate plaintiff for being argumentative. First, Metzen read the letter before FHK informed plaintiff her services were no longer needed. Second, that letter was not plaintiff's first challenge to management. Instead, it was the proverbial "straw that broke the camel's back." Management had met with plaintiff twice and received several emails before receiving that letter, *see* Dkt. 64, Exs. I and L.

Plaintiff suggests management's inconsistency with respect to discipline for insubordination demonstrates pretext. For reasons previously expressed by the court, however, that evidence fails to raise a genuine issue of fact on plaintiff's claim that FHK's justifications amounted to pretext. FHK is therefore entitled to summary judgment on this claim as well.

15

### D. Intentional Infliction of Emotional Distress

A claim for intentional infliction of emotional distress (or outrage) under Kansas law requires proof of four elements: 1) the conduct of the defendant was intentional or in reckless disregard of the plaintiff's rights; 2) the conduct was extreme and outrageous; 3) there was a causal connection between the defendant's conduct and the plaintiff's mental distress; and 4) the plaintiff's mental distress was extreme and severe. *Valadez v. Emmis Communications*, 290 Kan. 472, 476, 229 P.3d 389 (2010). Leaving aside the other elements, Walker cites no evidence that could reasonably support the second element. A claim for this tort exists only in the case of "extreme and outrageous conduct" that is "beyond the bounds of decency" and "regarded as atrocious and utterly intolerable in a civilized society." *Miller v. Sloan, Listrom, Eisenbarth, Sloan & Glassman*, 267 Kan. 245, 257, 978 P.2d 922 (1999). The evidence relating to the manner in which FHK terminated Walker falls far short of that exceptionally high threshold. FHK management informing Walker that "[her] services were no longer needed" while near her office's doorway, albeit with the door open and within her co-workers' hearing, is simply not extreme and outrageous conduct.

### E. After-Acquired Evidence Doctrine

The above rulings render moot the defendant's argument that the after-acquired evidence doctrine bars the recovery of damages. They also render defendant's motion in limine (Dkt. 35) moot.

**IT IS THEREFORE ORDERED** this 27th day of September, 2016, that defendant's motion for summary judgment (Dkt. 64) is **GRANTED** and its motion in limine (Dkt. 35) is **DENIED** as moot.

s/   J. Thomas Marten  
J. THOMAS MARTEN, Judge